UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


UNITED STATES OF AMERICA,    )
    )
              Plaintiff,    ) CAUSE NO.:
    ) 1:12–cr–23–SEB/DML–03
    ) 1:13–cr–31–01–SEB–TAB
    ) Indianapolis, Indiana
       –v–    ) **December 9th, 2013**
    ) 10:00 a.m.
PETER TRUONG,    )
    )
              Defendant.    )

**Before the Honorable
SARAH EVANS BARKER, JUDGE**


OFFICIAL REPORTER'S TRANSCRIPT OF
SENTENCING HEARING


**For Government:**    Steven DeBrota, Esq.
    A. Brant Cook, Esq.
    Assistant U.S. Attorney
    United States Attorney's Office
    10 West Market Street
    Suite 2100
    Indianapolis, IN  46204


**For Defendant:**    Angelyn Gates, Esq.
    LAW OFFICE OF ANGELYN GATES
    1155 Camino del Mar
    Suite 410
    Del Mar, CA  92014


Court Reporter:    Laura Howie–Walters, FCRR, CSR, RPR
    Official Court Reporter
    United States District Court
    46 E. Ohio Street
    Room 217
    Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER–AIDED TRANSCRIPTION

2

1            (Open court.)

2

3            THE COURT:  Good morning, all.

4            MR. DEBROTA:  Good morning, Your Honor.

5            MS. GATES:  Good morning, Your Honor.

6            THE COURT:  Apparently GSA has paid its heat bill.

7    They've got it revved up as they must have heard it was cold

8    outside, and they were going to compensate for that.  It is

9    not usually this toasty.  We didn't otherwise deliver very

10   well on the weather.  Did you have trouble getting in?

11           MS. GATES:  No, Your Honor.

12           THE COURT:  I was hearing all the national weather

13   reports about airports being shut down because of the weather

14   on the East Coast, so I hoped it hadn't inconvenienced you.

15           MS. GATES:  It did not.

16           THE COURT:  Nice to see you this morning.

17           MS. GATES:  You too, Your Honor.

18           THE COURT:  Nice to see you of course, Mr. DeBrota.

19           MR. DEBROTA:  Thank you, Your Honor.

20           THE COURT:  And you, Mr. Cook.  You may be seated.

21           All right.  This matter's on the Court's calendar

22   for a sentencing hearing.  Ms. Schneeman, would you call the

23   matter and we'll get under way.

24               (Call to order of the Court)

25           THE COURT:  Okay.  The file reflects that Mr. Truong

1  appeared previously for entry of a plea, which was accepted by

2  Judge Lawrence when the matter needed to be held

3  expeditiously, and so Judge Lawrence stepped in and handled

4  that matter, for which I was grateful.  I expect you were,

5  too, so that it could get resolved.

6           That set the stage for the preparation of the

7  Presentence Investigation Report.  That's been prepared and

8  I've reviewed it, and reviewed all of the other submissions,

9  so we're ready now, I think, to address the sentencing issues.

10          So Ms. Gates, would you like to escort Mr. Truong to

11 the podium, please.

12          Good morning, Mr. Truong.

13          THE DEFENDANT:  Good morning, Your Honor.

14          THE COURT:  Are you Peter Truong, the same person

15 named by the clerk when she just called this matter?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  Mr. Truong, what is your age?

18          THE DEFENDANT:  I'm 36, Your Honor.

19          THE COURT:  And how far did you go in school?

20          THE DEFENDANT:  I finished G12 High School.

21          THE COURT:  And some college, right?

22          THE DEFENDANT:  I did almost two years of college.

23          THE COURT:  So you can read and write the English

24 language?

25          THE DEFENDANT:  Yes, Your Honor.

4

1          THE COURT:  Along with Vietnamese?

2          THE DEFENDANT:  I can't read and write Vietnamese.

3          THE COURT:  You speak it, though, fluently at home?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Prior to coming to court, I know you've

6     been in custody, but have you consumed any substance, alcohol

7     medicine or narcotic, that would interfere with your ability

8     to understand and participate in this hearing?

9          THE DEFENDANT:  No, Your Honor.

10          THE COURT:  Are you under the care of a doctor for

11     any condition that might interfere?  Are you getting any

12     medications that would affect your mental stability?

13          THE DEFENDANT:  I haven't been getting my

14     medication, Your Honor.

15          THE COURT:  Say that again?

16          THE DEFENDANT:  I haven't been getting my

17     medication.

18          THE COURT:  Does that keep you from being able to

19     function mentally in a generally coherent fashion?

20          THE DEFENDANT:  It makes it difficult for me, but

21     I'll try my best.

22          THE COURT:  Is this medicine that's been withheld by

23     the marshal or by the prison?

24          THE DEFENDANT:  The prison os not giving me the full

25     dosage of what I've been prescribed.

1          THE COURT:  What is it that you've been prescribed?

2          THE DEFENDANT:  I've been prescribed 80 milligrams

3     of Geodon in the morning and a hundred milligrams of Geodon at

4     night, and they are only giving me 80 milligrams in the

5     morning, and that's it.

6          THE COURT:  Did they tell you why that was true?

7          THE DEFENDANT:  They said they had to order in the

8     medication for me.

9          THE COURT:  They have to order it?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  I suppose they do.  I mean, that seems

12    like the ordinary course of things.

13         THE DEFENDANT:  Yeah, but it's been quite a while.

14         THE COURT:  But you've been in custody about a year,

15    haven't you?

16         THE DEFENDANT:  Almost two years, Your Honor.

17         THE COURT:  Yes, that's right, and throughout that

18    time, you've not gotten your medication?

19         THE DEFENDANT:  No, it's been pretty good.  It's

20    only when I got back to Marion County that they started to

21    shorten my medication.

22         THE COURT:  I'm gesturing to the chief deputy back

23    here to see to that.  Will you please, sir?

24         MARSHAL:  Yes, Your Honor.

25         THE COURT:  Okay.  Can you understand what I'm

1  talking to you about today?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Okay, that's good.  So as you heard me

4  say earlier, the record reflects your entry of a plea to both

5  of these charges against you, and the Court's acceptance of

6  it, and the subsequent preparation of the Presentence

7  Investigation Report by the probation office.

8          So Ms. Fitzgerald is here, did you recognize her

9  this morning when you came in?  You were interviewed by her;

10  do you remember that?

11         THE DEFENDANT:  Yes, I remember.

12         THE COURT:  So she prepared the report and I want to

13  make sure you've had an opportunity to review it.  Have you?

14         THE DEFENDANT:  Yes, Your Honor, I have.

15         THE COURT:  And did you go over it carefully with

16  Ms. Gates so you know exactly what it is that's written there?

17         THE DEFENDANT:  Yes, Your Honor, I have.

18         THE COURT:  Ms. Gates, have you had sufficient time

19  to review the report and prepare?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  And, Mr. DeBrota, have you, sir?

22         MR. DeBROTA:  We have, Your Honor, and we are

23  prepared to proceed.  I think it's their desire to do so as

24  well.  I don't like his last answer to your question to the

25  Court, though.

1           THE COURT:  About the medication?

2           MR. DeBROTA:  Yes, and how he was feeling.  I think

3    both his counsel and Mr. Truong want to proceed this morning

4    in his current state.  I'd like to have that very clear if we

5    could.

6           THE COURT:  Is that true?

7           THE DEFENDANT:  Yes, it is true, Your Honor.

8           THE COURT:  I don't perceive any failure to

9    comprehend.  Do you, Ms. Gates?

10          MS. GATES:  No, Your Honor.

11          THE COURT:  So with respect to the reduction in

12   medication, have you been conferring with him during this

13   period of time and have you noticed a difference?

14          MS. GATES:  I have, Your Honor.  I have been

15   conferring with him, and it is a regular course when he was

16   transferred from one unit to the next or one facility to the

17   next that the medication needs to be adjusted over time

18   because of the transport.  And he always has a little bump in

19   the road, but I've spoken with him at length yesterday, and

20   I've spoken with him this morning, and he's fine.

21          THE COURT:  Is this true?

22          THE DEFENDANT:  Yes, that's true, Your Honor.

23          THE COURT:  In addition to the report, I have

24   numerous other submissions that I want to mention to you just

25   so that they are in the record and you have had an opportunity

1   to see them as well.

2           I have the sentencing memos from both sides.  Did

3   you read the Government's?

4           THE DEFENDANT:  Yes, Your Honor.

5           THE COURT:  And the one that Ms. Gates filed on your

6   behalf?

7           THE DEFENDANT:  Yes, I did.

8           THE COURT:  And I have various letters, mostly from

9   family members, but a few other acquaintances.  Did you read

10  those as well?

11          THE DEFENDANT:  Yes, I have, Your Honor.

12          THE COURT:  And I have the 5K.1 submission that the

13  Government has filed attesting to your substantial assistance;

14  did you read that?

15          THE DEFENDANT:  Yes, I have, Your Honor.

16          THE COURT:  And did what they submitted satisfy your

17  expectations of their making known to me the nature and extent

18  of your cooperation?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  No objections to that, then?

21          THE DEFENDANT:  No, Your Honor.

22          THE COURT:  Is that your view as well, Ms. Gates?

23          MS. GATES:  Yes, Your Honor.

24          THE COURT:  So I have that as well.  Nothing has

25  come to me, Mr. Truong, that I've withheld from you.  So there

1 have been no other letters, no communications, no e-mails,

2 texts, that sort of thing.  So you know everything that I know

3 of a factual nature on the basis of which I'll make a

4 sentencing decision today.  Do you understand that?

5             THE DEFENDANT:  Yes, Your Honor.

6             THE COURT:  I do have Ms. Fitzgerald's confidential

7 memo that under our rule of court, the probation officer who's

8 assigned to a case, is obligated to prepare a memo to give to

9 the sentencing judge that outlines a possible way of

10 fashioning the sentence.

11             There are no new facts in her memo.  All the facts

12 relate to this report.  But her memo is intended basically to

13 serve as a checklist so that I don't leave something out

14 that's important to address.  And it's not disclosed to anyone

15 else.  But as I say, there's no prejudice to you from that

16 because it has no new factual matters in it.  Do you

17 understand that?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  Now, when you read through the report, I

20 assume you noticed, but I want to make sure you noticed, that

21 it has two kinds of information.  One part of the report has

22 to do with you biographically.  It's sort of a summary or a

23 snapshot of your history and your life, your health, your

24 education, your family situation, and so forth.

25             The other part of the report has to do with this

1  offense that you've been charged with, or these two offenses

2  that you've been found guilty of, and how the sentencing

3  guidelines apply and what the sentencing options are.  So did

4  you notice that about the report, it has these two kinds of

5  information?

6         THE DEFENDANT:  Yes, Your Honor.

7         THE COURT:  This is a document that's tailor-made to

8  you.  It's made for the purposes we're using it for today.

9  There are a few other official uses that can be made of it by

10  the Bureau of Prisons or the courts, the probation department

11  and so forth, but it's limited to those.  So you don't need to

12  worry about it getting out in a way that would embarrass or

13  compromise your security.

14         It's a document we keep under seal, we say.  So it's

15  in a confidential status in the court's files, and beyond

16  these official uses, it will not be disseminated.  Do you

17  understand that?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  The other letters and so forth I assume

20  that you wish to have retained under seal; is that right,

21  Ms. Gates?

22         MS. GATES:  Yes, Your Honor.

23         THE COURT:  Same with you, Mr. DeBrota?

24         MR. DeBROTA:  Our pleading is not under seal, Your

25  Honor, and we designed it as such that it didn't need to be.

1           THE COURT:  All right, except for the 5K.1?

2           MR. DeBROTA:  Oh, yes, that's correct, Your Honor.

3    I was thinking of the other one.

4           THE COURT:  Now, the point at which we're headed in

5    this hearing is for me to have sufficient clarity of

6    understanding to impose a reasonable sentence.  And you can

7    hear by the way I said that that I sort of underscored or

8    highlighted that word "reasonable," and that's because that's

9    an important word.  It's a word of art in this context.

10          It doesn't mean if it just seems right to me.  It

11   doesn't mean if it seems right in a sense that I ask around

12   the courtroom and said, "How about that one, everyone?  Do you

13   think that's a good sentence?"  It's reasonable under law.

14   And the law sets out the criteria for a reasonable sentence.

15          It's like a yardstick.  So it doesn't matter too

16   much which federal district court judge you appear before, in

17   which district, because we all use the same measuring stick.

18   And that ruler or measuring stick is in the statute, and the

19   lawyers and I refer to it by a number because it's easier to

20   keep track of that way, and that statute is 3553(a).

21          The factors that are in that statute, there are

22   seven factors that the Court is to use to guide discretion in

23   imposing a sentence, and to the extent that I succeed in

24   folding those factors into my decision today, it will be

25   deemed a legally reasonable sentence.

12

1        And Ms. Fitzgerald, helpfully, has included those

2   right towards the end of the presentence report.  So I just

3   want to highlight them so that you know, because you read them

4   before, what I'm talking about.  They are in paragraph 109.

5   Do you have that, Ms. Gates?

6        MS. GATES:  Yes, Your Honor, and it's before him

7   right now.

8        THE COURT:  Okay.  So those are the factors that I'm

9   referencing that are lifted right out of the statute, and they

10  are the guide for my discretion.

11       So we go through a sentencing guideline

12  determination and I'll take into account as well your

13  11(c)(1)(c) agreement, and all of those factors, but my

14  judgment will be guided by these 3553(a) factors.

15       Do you understand that, sir?

16       THE DEFENDANT:  Yes, Your Honor.

17       THE COURT:  The guidelines are important, and we do

18  a correct calculation and application of the guidelines

19  because in important ways, they incorporate these seven

20  factors.  But the guidelines don't have the final word with

21  respect to the final decision.

22       The final decision, the final judgment, is mine to

23  make, but those sentencing guideline factors are influential.

24  Don't discount them.  And the reason they are is because they

25  find their way into these seven statutory factors as well.  Do

1  you understand that, sir?

2         THE DEFENDANT:  Yes, Your Honor.

3         THE COURT:  So when the guidelines were employed to

4  your case, Mr. Truong, you have a total offense level of 46

5  and a criminal history category of 1.  Do you remember how we

6  got to those numbers?

7         THE DEFENDANT:  Yes, Your Honor.

8         THE COURT:  Did you look at the table in the

9  sentencing guideline manual?

10        THE DEFENDANT:  Yes, I did, Your Honor.

11        THE COURT:  That grid?

12        THE DEFENDANT:  Yes, Your Honor.

13        THE COURT:  And you can see from that that's where

14  we got the guideline ranges?

15        THE DEFENDANT:  Uh-huh.

16        THE COURT:  Do you remember that?

17        Now, before we go through the guidelines, I want to

18  address the matters that were raised in the addendum.  When

19  the addendum was prepared, to capture the objections of the

20  parties, it reflects that the Government has no objections to

21  the report; is that your view, Mr. DeBrota?

22        MR. DeBROTA:  That's correct, Your Honor, though we

23  did file the under seal 5K.1 motion after the report.

24        THE COURT:  There are several objections that are

25  interposed by you, Ms. Gates, on behalf of Mr. Truong, but I

1  didn't think any of them related to the guideline calculation;

2  is that right?

3          MS. GATES:  That's correct, Your Honor.

4          THE COURT:  So I've read them, I take note of them.

5  Where there's a difference of opinion, I note the difference

6  of opinion, but otherwise, there's no necessity of a ruling;

7  is that true?

8          MS. GATES:  That's correct, Your Honor.

9          THE COURT:  So I'll adopt the formulation that's

10  laid out in the Presentence Investigation Report, and proceed

11  on the basis of a total offense level of 46, and a criminal

12  history category 1.

13          The upshot of that, Mr. Truong, is that the

14  guideline ranges for your sentence are as follows:  For the

15  period of incarceration, it's 40 years, or 480 months.  You're

16  not eligible for probation.  The period of supervised release

17  is life.

18          Do you remember what supervised release is?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  The fine range is $25,000 on the low end

21  and up to 250,000 on the high end.  Restitution, which means

22  paying back the victim, is not applicable here.  The special

23  assessment of $200 is reflected as a hundred dollars per

24  count.  That's a nonwaivable fee.  And it will have to be

25  paid.  Can that be paid today, Ms. Gates?

1          MS. GATES:  I believe so, Your Honor.

2          THE COURT:  Would you stick with it long enough to

3     get that payment made to the clerk's office?

4          MS. GATES:  Absolutely.

5          THE COURT:  Our clerk's office is on the first floor

6     here.

7          So those are the guidelines, Ms. Gates.  Do you

8     agree with that extrapolation of the guidelines?

9          MS. GATES:  I do, Your Honor, based with the

10    exclusion of the 5K, but --

11         THE COURT:  Right.  This is the guideline before we

12    take that into account.

13         MS. GATES:  That's fine.

14         THE COURT:  Do you agree with that as well,

15    Mr. DeBrota?

16         MR. DeBROTA:  I do.

17         THE COURT:  So under the 5K.1 motion and the plea

18    agreement, the Government is recommending a five-level --

19         MR. DeBROTA:  Six.

20         THE COURT:  -- six-level reduction.  And in light of

21    that, the 11(c)(1)(c) agreement, that was the sentence.

22         MR. DeBROTA:  I'm sorry, just a second if I could,

23    Your Honor.

24              (Off-the-record discussion.)

25         MR. DeBROTA:  Can I confer with counsel for a

1 second?

2          THE COURT:  Yes, turn off your mics, please.

3               (Off-the-record discussion.)

4          MR. DeBROTA:  Your Honor, the plea agreement

5 provides for a five-level reduction.

6          THE COURT:  I thought that's what I read.

7          MR. DeBROTA:  And I think our motion may have had a

8 typographical error when we said six, but we need five to get

9 to the range that the Presentence provides, which is 324 to

10 405, which is what I just conferred with defense counsel

11 about.  So you're correct, it should be five levels.

12          THE COURT:  I agree the plea agreement had said

13 five, and your 5K.1 said six.

14          MR. DeBROTA:  We meant that to be five in both

15 places.  So I would move to amend the filing under seal to

16 comport that to five levels, Your Honor.

17          THE COURT:  Okay.

18          MR. DeBROTA:  Resulting in a range of 324 to 405, if

19 the Court agrees with the filing when we're done.

20          THE COURT:  Yes, but that would be equal to an

21 offense level of 41.

22          MR. DeBROTA:  Correct, and that's the plea agreement

23 range.

24          THE COURT:  It's a rather significant typo, since

25 it's also written out in words.  So it's more a substantive

1   error than a typo, but we don't have the capacity to change

2   the electronic filing by a marginal note here, but I will make

3   specific reference to the fact on the docket that the 5K.1 was

4   amended at the hearing.

5           So Ms. Dame, can you make note of that, and would

6   you please, too, Miss Fitzgerald?

7           So the guidelines that apply at a level 41 are 324

8   months up to 405 months.  That's different from what you have,

9   Ms. Fitzgerald.

10          PROBATION OFFICER:  Yes, Your Honor.  When you're

11  calculating the guideline range, you don't take into account

12  the 5K.  You take in the 5K later on at sentencing.

13          THE COURT:  So this is before the six level?

14          PROBATION OFFICER:  Yes.

15          THE COURT:  Okay, got it.  The agreement that you've

16  reached, which is an 11(c)(1)(c) agreement, which is a binding

17  plea agreement -- remember, under a binding plea agreement, I

18  have two choices, yes or no, although the yes gives me a bit

19  of a range, but you remember the agreement you made was that

20  the sentence would be between 324 months and 405 months as the

21  period of incarceration.  Do you remember that?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  You don't have to be quite so close to

24  that mic.  It's picking it up fine.

25          The supervised release term that you agreed to is a

1  life term.  And the fine and restitution were left to me to

2  decide, or at least I'm to hear some recommendation from the

3  parties.  And you agreed to forfeiture as part of your

4  agreement.

5              Part of your agreement also involves the Government

6  dismissing Counts 2 through 4, filing the 5K.1, and if the

7  plea agreement is accepted, you're giving up your right to

8  appeal the sentence.  Do you remember those elements of the

9  plea agreement?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  Do you want to proceed on the basis of

12 that agreement?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  So do you have any questions you want to

15 ask me about the procedures we're going to follow or do you

16 have any responses to the presentence report that were

17 calculated?

18             THE DEFENDANT:  I don't.

19             THE COURT:  So the point now where we're heading, as

20 I said, is for me to have a sufficiently clear understanding

21 to impose a reasonable sentence.  And it's appropriate for you

22 to speak, Mr. Truong, to address the Court, and to tell me

23 whatever it is you want me to know and think about and take

24 into account.

25             I'm confident over the past couple of years you've

1 had a lot of time to think about these things and probably

2 think about today.  And so don't put off till some other time

3 whatever it is you think I ought to know and think about and

4 take into account, because there's not likely to be another

5 time when the Court addresses this matter.

6          After I hear from you, I'll hear from Ms. Gates on

7 your behalf.  And I'll hear from Mr. DeBrota or Mr. Cook on

8 behalf of the Government when it's their turn.

9          You need to know, and so I say explicitly, that I've

10 read all of the materials that have been submitted, but you

11 may augment them in some way or highlight them if you wish,

12 and whatever it is you wish to say, I'll be eager to hear.  So

13 you may speak now.

14          THE DEFENDANT:  Thank you, Your Honor, for letting

15 me address the Court.  Firstly, firstly, I just want Your

16 Honor to know I'm a bit nervous.  If I stumble, please forgive

17 me.

18          THE COURT:  You're not the first person who's stood

19 there who's been nervous.  It's all right.

20          THE DEFENDANT:  Yeah.  I just wanted to state that I

21 don't like calling my son "Boy 1."  It's just very cold and

22 very anonymous.  You know, I love him a great deal.  I love

23 him with every heart, every part of my body, every ounce of my

24 breath, I love him.  And he's an innocent and beautiful person

25 to me, and he's not anonymous to me.  But I understand that I

1  have to call him "Boy 1" because that's just the rule that I

2  have to follow today.

3            THE COURT:  We don't want to cause him any more

4  injury.

5            THE DEFENDANT:  I don't want to cause him any more,

6  no.  I have a great deal of regret for what I've done.  I

7  always wanted to give my son the very best of everything.  And

8  I wanted to be a very good parent to my son.

9            What happened has devastated me.  When I found out

10  that what I was doing to him was wrong, it really hurt me a

11  great deal.  I couldn't eat, I couldn't sleep.  I was -- there

12  was just -- it was -- I was just shocked and guilt ridden over

13  all of this.

14            And I want to say thank you to the authorities for

15  saving my son and also for saving me as well because for 27

16  years, I've gone down the wrong path, misguided and misled by

17  ideals that I thought were right.

18            Now I've been freed from that, and I feel free.  In

19  my heart, I feel like I'm free.  I'm no longer bound by all

20  the bad things that I've been taught, from all these bad

21  people that I've come into contact with.  I can see clearly

22  now, and I can see my life as it stands without the influences

23  of all these other bad people.

24            With the right medication and with the right

25  psychological help, I'd like to get myself better.  I'd like

1  to become a better person, and I'd like to live a better life.

2  I need to stay alive and to stay strong for my family who are

3  with me here today, and also for my son who will grow up and

4  wonder what happened to his parents.

5          I'd like to say thank you to God for giving me a

6  chance to break free, break free of these bonds that have

7  entrapped me for so long, and to let me see how wrong I've

8  been throughout my whole life, and let me become who I really

9  am.  I can stand on my own and say this is me.

10          I've met a lot of good people over the last two

11  years, my doctor and my therapist, and they have really helped

12  me out a lot to help me come to terms with what has happened,

13  and to help me accept and look to the future, to heal, and to

14  move on.

15          I'd also like to thank my family and friends who

16  have supported me throughout the last two years.  They have

17  really helped in my recovery and really helped to get me where

18  I am today.

19          By the same token, I would like to apologize to them

20  for all of the pain and all the suffering that this has caused

21  to them, because I know that it's not only me that's been

22  hurt.  It's my family and it's my friends, and people that

23  love and care about me that have been hurt throughout all of

24  this.

25          I want to tell my mom and dad, who are here today,

1  that it's not their fault what happened to me as a child.

2          THE COURT:  They feel like it is.

3          THE DEFENDANT:  I don't.

4          THE COURT:  I read their letters.

5          THE DEFENDANT:  I don't want them to think that way.

6  They did what was best for me.  They worked hard to provide

7  for me, and to teach me, and to give me good education, to

8  give me the good home, and to give me the clothes that I wore,

9  and the toys that I played with.  I can't blame my parents for

10 any of this, and I don't.

11         I want Your Honor to know that I will live through

12 this, and I will get through this.  I will be strong, and I

13 will fight to survive.  I also want to show others that they

14 can survive abuse as well.  And I want to stay strong for my

15 family.  And I want to also show my son that he needs to be

16 strong as well, because these are difficult times for him,

17 too.

18         And I will try to help others and stop the man/boy

19 love lie that's ruined my life and caused me to be where I am

20 today.

21         Lastly, I'd like to thank you, Your Honor, for

22 listening to me and for reading the letters and for reading

23 the sentencing memorandum and for putting in so much time on

24 my case.  I thank you for trying to see me as a human being,

25 to see me as who I really am, and not the monster that others

1 might portray me to be.

2          I'm a person capable of love.  I'm capable of

3 friendship and capable of sharing, capable of giving to those

4 that I love, and those that I care about, and I'm capable of

5 doing the right thing.  I just need more therapy to help me

6 heal, and I've been lucky enough to get therapy.

7          These past seven months, I've begun getting

8 extensive therapy, and counseling in the jail has helped me

9 out a lot, helped me understand me, and helped me to have hope

10 and look to the future.

11          I just need a chance to be the person I would like

12 to have been if I had had a chance to grow as a normal child.

13 I want a chance to make my life right.  And I thank you, Your

14 Honor, for listening to me.

15          THE COURT:  Well, that's an important statement

16 you've made, Mr. Truong, and I think it's important for all to

17 hear it, but especially important for you because you've said

18 out loud some important things about where all of this has

19 brought you, and the change that's occurred, thank God, from

20 the person who was capable of doing these horrific acts, and

21 not just capable of them, but did them, and did them in league

22 with other people who were similarly motivated to do real

23 harm.

24          It did occur to me in the course of reading all the

25 materials about you, and in the helpful analysis that the

1 psychiatrist provided that your counsel submitted as part of

2 her memo -- did you read that?

3          THE DEFENDANT:  Yes, I have, Your Honor.

4          THE COURT:  Was that enlightening to you to have it

5 laid out in sort of a scientific, medical professional --

6          THE DEFENDANT:  It helped me a lot, Your Honor.

7          THE COURT:  I would assume that it sort of mirrors

8 what you say is the help from the therapy that you're getting.

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  The fact that it's pulled together and

11 collated and presented in an organized way sometimes gives it

12 an extra push --

13          THE DEFENDANT:  It helps me understand myself, Your

14 Honor.

15          THE COURT:  Let me finish my thought -- and that is

16 that in reading all this material, it occurs to me that

17 there's a theme that runs through it that makes you the

18 victim.  And you're not here because you're a victim.  You're

19 here because you victimized others.

20          You may have acted out of some of your own

21 pathologies and disabilities and so forth, and so in that

22 sense you're a victim, but you would not be before the Court

23 for sentencing in conjunction with these two cases but for the

24 harm you caused to others, and the harm that you caused in

25 particular to Boy 1.

1      But even that wouldn't have brought you necessarily

2  to the Court.  It was what you did to Boy 1, and in that

3  sense, expanded the influence of this kind of behavior and

4  this kind of addiction, this horrific behavior, and all the

5  ripples that go out, because this wasn't isolated.

6      You were doing this as part of a larger pattern of

7  behavior by many people, who not only indulged themselves in

8  these activities, but encouraged you and exacerbated what you

9  were doing, and took advantage of what undoubtedly was your

10  own weakness for all the reasons that had arose.

11      But you have to be responsible for your own

12  behavior, your own part of it.  And in that sense, you're not

13  the victim here, Mr. Truong.  I don't think I fully understand

14  but I understand as best I can what led up to this.

15      So in that sense, it's been put in perspective, but

16  it doesn't excuse what you did.  It doesn't forgive what you

17  did.  You have to be accountable for your own behavior.  And

18  the harm that you caused was indescribably bad, horrific.  And

19  anyone who familiarizes themselves with the facts of this

20  whole situation, how Boy 1 came to be your son, and then how

21  you misused that opportunity, that privilege of being a

22  parent, and the pathologies that flowed from your taking

23  liberties with him, and taking advantage of the relationship

24  between you where he trusted you completely.  You were his

25  parent.  And he was much, much too young to make any decisions

1  for himself.  He couldn't protect himself.  And in all of

2  that, you were the perpetrator.  You were not the victim.

3          So through the letters, I see how there is an

4  explanation.  They could say "Well, you were acting out of

5  your own psychological difficulties."  And in that sense, you

6  were a victim to your open problems and your own background

7  and history and the abuse you suffered and so forth.  But the

8  chain has to be broken.

9          The answer to abuse of children is not to permit

10  abuse by those children when they get to be adults.  And

11  there's a huge societal stake in stopping the chain of abuse.

12          The problem, of course, with the Internet is that it

13  makes these relationships go on and on and on, and expand the

14  harm exponentially, so that it makes it even more difficult to

15  correct and to offset with the societal correctives that we

16  have.  They never cease to measure up to the harm.  We make an

17  effort but it's a bandaid on the problem.

18          That said, you took the situation as you found it

19  when you were apprehended, and you did your best to rectify

20  the situation by making the information known to the

21  Government that was available to you because you were right in

22  the middle of this big network.  So you had information that

23  was helpful to the Government not only in your case but in

24  trying to battle this problem of child pornography.

25          So it's very complicated because it's so

1  multi-layered, and it would be so easy to say "Well, there are

2  easy decisions to be made here in terms of punishment."

3  There's nothing easy about this.  As horrific as this is,

4  there's nothing easy about this.

5            Ms. Gates, what would you like to say on

6  Mr. Truong's behalf?

7            MS. GATES:  Your Honor, I would first like to say

8  that we both, Mr. Truong and I, do agree with your statement

9  that his background and his history is certainly not an

10 excuse.  It's an explanation, but has never really been

11 intended to ever be an excuse.

12           And mr. Truong, it did take him a while to be able

13 to work through all of his issues and psychological problems

14 and get himself straight on medication so that we could then

15 proceed to provide the significant cooperation that he has

16 done.

17           I am -- I did not hear Your Honor mention the status

18 report for -- the Boy 1 status report that I filed.  And I'm

19 hoping --

20           THE COURT:  I do have that.

21           MS. GATES:  Yes, because I just wanted to make sure

22 that Your Honor was provided with something as to the current

23 status of Boy 1.

24           THE COURT:  I do have that with the photos.

25           MS. GATES:  Okay, because he is doing well.  And I

1  also want -- I want to be clear from the beginning with Your

2  Honor what I'm asking for on Mr. Truong's behalf, is that Your

3  Honor accept the plea agreement and follow the plea agreement.

4  And of course the Government's going to be arguing for, as

5  they did, the greater of the sentence optioning.  I'm going to

6  be asking Your Honor to consider the lower range for a number

7  of reasons which I want to point out as I go along.

8          One thing I didn't actually put into my sentencing

9  memorandum, because I've been trying to get some

10  clarification, but there is -- the treaty with Australia and

11  the United States is intact with regards to prisoner exchange.

12  And even though there's been some confusion in all of the

13  documents that have been filed, my client is only a citizen of

14  Australia.  He has never been a citizen of this country.  And

15  he actually technically is now illegally here.  His visa to

16  come, or whatever the technical term for him to be legally

17  here when Boy 1 was taken into custody, has long since

18  expired.

19          Even though he was born in Vietnam, they do not, in

20  my understanding and I've double-checked this, the Vietnamese

21  government shuns anyone who has left and become a citizen of

22  another country.  So he only has one citizenship, Australia,

23  and the reason why that's very important is because his entire

24  family lives in Australia.

25          So it is our hope that at some point, he would be

1   able to make an application under the treaty to be able to

2   serve out the rest of his sentence in Australia.

3          In Australia, the maximum sentence for one of these

4   charges would be 25 years.  So in hopes of him being able to

5   have a sentence that is closer to their maximum would

6   facilitate him being able to apply and be accepted into that

7   program.  And so that's a major concern for me as his counsel

8   for a number of reasons.

9          One, he is a witness in his own abuse.  And that

10  case, as I mentioned in my memorandum, has been opened and is

11  being furthered with the assistance -- with the very thankful

12  assistance of -- the investigator in this case actually is

13  going to help in furthering that investigation.

14         Additionally, Mr. Truong actually has charges

15  pending in Australia as well because of this and the shared

16  information and facilitation between the two countries and the

17  investigative agencies.  And I actually went to Australia and

18  went down to the police department as part of what I was doing

19  in this case, and in order for Mr. Truong to hopefully be able

20  to deal with the charges there, without coming out of custody

21  here and then having to be deported back there and then

22  dealing with the charges, it would be advantageous to

23  everyone, I believe, if he could actually deal with his

24  charges in some kind of a fashion sooner than 30 something

25  years.

1          Additionally, obviously for -- it may not be of any

2     consequence in reality, but for the financial aspects of

3     Mr. Truong being incarcerated here as a citizen, he can be

4     incarcerated in his country as well.

5          Additionally, his parents, Your Honor, are not young

6     people.  It's extremely difficult for them to come to see him

7     in this country.  And inmates, as part of -- I think it's very

8     important that they be able to have family visits to help them

9     get through their incarceration and to keep positive and

10    strong, and that would be almost impossible for Mr. Truong if

11    he has to do his full incarceration in this country.

12          THE COURT:  He has relatives in Arizona, doesn't he?

13          MS. GATES:  Mr. Truong's relatives are in -- I'm

14    sorry, Mr. Newton's relatives are in Arizona.  Mr. Truong has

15    some extended family here.  In fact, there's a member of his

16    extended family here, but his core family is all in Australia.

17          And under the circumstances of this case,

18    Mr. Newton's family has Boy 1, but I don't anticipate there

19    would be any support for Mr. Truong from that part of the

20    family.  So that is something that I would ask Your Honor to

21    consider, and I think it has some relevance.

22          Additionally, I want to mention a few minor things,

23    inconsistencies in some of the papers that I didn't want to

24    just let go.  Accuracy's very important to me, and what I

25    represent to the Court is very important to me.

1          So I just want to let Your Honor know that I

2    confused in my sentencing memorandum the time frame that

3    Mr. Newton married the woman in Russia.  It's a small detail

4    that you might not have noticed, but if you did notice it, it

5    was my error.  It was not my client's representation, and I

6    don't want that to fall on him.

7          Additionally, my client started to suffer from

8    mental illness after Boy 1 was removed but before he was

9    arrested, and that fact is confused in the presentence report,

10   and I did not catch that when I did my objections.

11         Another minor thing that my client wanted to bring

12   to Your Honor's attention is that the Presentence Report

13   indicates he's 5'6", and he's really only 5'4".  I know that's

14   not of major significance, but he did want me to let you know

15   that.

16         The other thing I want to point out is the mention

17   about the German boy that is in the presentence report and in

18   the Government's sentencing memorandum.  I just want to point

19   out that my client has always maintained that he never had any

20   direct communication with that German boy who spoke only

21   German, and my client doesn't know German.

22         I think maybe it's based on hearsay and there may be

23   some hearsay transmission problems there.  However, Mr. Newton

24   was also there, and my client has no idea what Mr. Newton did

25   or didn't do vis a vis that communication with that boy, but I

1   wanted everyone to be aware that my client maintains that he

2   never personally solicited the German boy that's referenced.

3                   THE COURT:  Did he go to Germany?

4                   MS. GATES:  He, in fact, went to Germany.

5                   THE COURT:  Did he meet with the father of the boy?

6                   MS. GATES:  Absolutely did not --

7                   THE DEFENDANT:  And the mother as well?

8                   THE COURT:  I beg your pardon?

9                   THE DEFENDANT:  And the mother as well?

10                  MS. GATES:  There's only one part of that that he

11  wanted me to make sure that I put forth.

12                  Additionally, the Government's --

13                  THE COURT:  Wasn't that the purpose of the trip, to

14  establish a liaison with the boy?

15                  MS. GATES:  Not on behalf of my client, Your Honor,

16  no.

17                  THE COURT:  What was the purpose from his point of

18  view?

19                  THE DEFENDANT:  Sightseeing, Your Honor.

20                  THE COURT:  I beg your pardon?

21                  THE DEFENDANT:  Sightseeing, and look at some German

22  castles.

23                  THE COURT:  So you went to that particular place,

24  that particular household --

25                  THE DEFENDANT:  Well, because he --

1          THE COURT:  -- for sightseeing?

2          THE DEFENDANT:  Because he lives in a certain area

3 of Germany that we wanted to see, and Bavaria.

4          THE COURT:  I think that was a side purpose.  Why

5 would he choose all of Germany and all the people in Germany

6 for sightseeing if it was not to have a liaison with that

7 particular kid?

8          THE DEFENDANT:  To be honest with you, Your Honor, I

9 had -- I had no interest in the German boy, and it was not for

10 any purpose such as that.

11          THE COURT:  Was it Mr. Newton's interest?

12          THE DEFENDANT:  That I don't know.

13          THE COURT:  Did you travel with Mr. Newton?

14          THE DEFENDANT:  I did travel with Mr. Newton.

15          THE COURT:  Did he make the decision to your

16 recollection?

17          THE DEFENDANT:  Not that I recall.

18          THE COURT:  Odd.  Okay.  Go ahead, Ms. Gates.

19          MS. GATES:  In the Government sealed 5K part of the

20 Government's submissions, the memo does not acknowledge any

21 risk to my client or his family due to the assistance they

22 provided, and I just wanted to point out that there has been

23 negative possibilities.  He has been put into different

24 isolated situations in the facility because of some of the

25 press and whatnot.  So that does cause him some negative

1   situations.

2           Additionally, the other -- as you have indicated,

3   the people involved in this are extremely widespread.  And

4   there has to be in their understanding of how they, the other

5   co-defendants and other defendants, came to be where they are,

6   there is disclosure.  And there's so many of them in the

7   facility, my client will have to be kept in different places,

8   and it will be because of that.

9           Additionally, Your Honor, my client had to have a

10  significant amount of consultation with me regarding the

11  possible ramifications of him doing what he did.  One of those

12  possible --

13          THE COURT:  You mean his crime or his assistance?

14          MS. GATES:  No, his assistance.  One of those

15  ramifications was directly related to a possible precarious

16  situation that Boy 1 could face and may face with regards to

17  his nationality and some issues there that I don't really want

18  to go into in great detail, but I think Your Honor

19  understands.

20          THE COURT:  I do understand, and you shouldn't go

21  into detail.

22          MS. GATES:  It took him a long time to be able to

23  have the courage to move forward in hopes that everything,

24  even with his own family in Australia and the disclosures,

25  that I just wanted to point out that although it may not be

1  the classic typical danger situation that some of the -- some

2  defendants come before you in, there was a lot of significant

3  negative repercussions that he needed to work through.  So I

4  wanted that point to be made.

5        Additionally, I am fully aware of, as is everyone,

6  the extreme significant tragedy and horrific aspects of this

7  case.  It is my responsibility to have the courage to stand

8  before Your Honor and to bring up some issues that are, I

9  believe, in mitigation, although they are -- could be argued

10  at first blush to be aggravating factors as well.  And I

11  don't -- I cannot apologize for having to do that, but I do

12  understand that it's a difficult position for all of us to be

13  in.

14        THE COURT:  I understand your role.

15        MS. GATES:  For instance, in the Government's

16  sentencing memorandum, the comment is made that this was the

17  worst form of sexual exploitation of children, and I have to

18  disagree with that in the sense to the extent that I don't

19  have any indication, nor do I believe there is any, of any

20  actual physical violence.

21        There are many cases that we see, unfortunately,

22  where there's physical violence of children, kidnapping, and

23  even murder for these types of situations.

24        And this is extreme, without question, but I don't

25  think it's the worst that we've ever seen.  And again, I have

1    to point out that in all of the review which we've done, there

2    was no indication of any actual physical pain or fear of Boy 1

3    or any of the individuals my client was involved with.

4         My client's already addressed his situation with

5    regards to the acquiring of Boy 1 was through -- on my

6    client's behalf, not ever intended originally to be for the

7    purpose of any abuse.  It turned into that, absolutely, but

8    that was not his purpose.

9         I think that additionally, there is a big difference

10   between Mr. Truong and Mr. Newton.

11        THE COURT:  Mr. Newton said as much, but it wasn't

12   very complimentary of Mr. Truong.  So you have to know that

13   Mr. Newton is not and did not take full responsibility for all

14   that happened, vis a vis Mr. Truong.

15        MS. GATES:  I understand that, and let me -- I want

16   to point out that I think that Mr. Truong's actions speak

17   louder than anything.  And one of the things that I think most

18   strongly points to the fact that he, in fact, is a different

19   person, and has learned and changed and grown, and knew from

20   the beginning how tormented his life was, was that when he did

21   make the decision to, even under the negative possible

22   consequences, go ahead and do certain things, one of the

23   things that he did was decrypt the computer knowing there were

24   things on that computer that would subject him to further

25   charges and possible further incarceration, knowing that it

1  would help other people, and not protect himself.  And he made

2  that decision to not protect himself at all.  And I don't

3  think -- there's so much information on that computer, we

4  couldn't possibly put it all before Your Honor, but there were

5  some specific things that no one knew about until Mr. Truong

6  openly opened up the computer and talked freely, and it really

7  benefited a lot of people.

8         So the question I think that Your Honor may have

9  under consideration is what is the difference between other

10 people in this situation, Mr. Newton and Mr. Truong, and I

11 believe there are factors that Your Honor could consider to

12 determine that Mr. Truong is appropriate to have a lower

13 sentence.

14        One is that Mr. Newton did nothing to help anyone in

15 any way, and he got his sentence.  He -- not only did he not

16 help, but he lied.  My client has not done that.  Mr. Truong

17 was -- and as you've stated, it is not an excuse, it's an

18 explanation -- a victim himself.  There's no indication that

19 anyone else in this case was.

20        He was victimized as a teenager and as a child.  He

21 was brought into this man/boy cult when he was not even an

22 adult, and again, it's not an excuse, but it is an

23 explanation.

24        He tried to help.  Mr. Truong tried to help Boy 1,

25 his son, when no one else, as far as on that side did, by

1 writing a letter to him, encouraging him to tell the truth and

2 not protect anyone.  That letter I don't believe was ever

3 delivered, but the fact that he would go out and try to do

4 that, I think, is important.

5       Additionally, Mr. Truong suffered countless hours of

6 actual personal torment in recounting all of these things that

7 he did.  His psychological condition was always a factor every

8 time he would go and he would have a session with the

9 Government.  He went to New Jersey.  He, each time, had to

10 recount any time he spoke to someone things that not only are

11 extremely embarrassing to him, but very emotionally difficult,

12 and he would physically shake and need time to recover.

13       So he really has suffered immensely in trying to

14 assist and cooperate, and it was not easy for him, but he

15 fought through it, and I wanted Your Honor to know that.

16       In closing, I have a few miscellaneous comments.

17 Your Honor had mentioned Dr. Halon's report that explains why

18 Mr. Truong's childhood abuse so badly obstructed his ability

19 to grow into a normal adult, and how he was so easily

20 victimized.

21       Additionally, Mr. Truong's father, Sang Truong, is

22 in court today, and as you had mentioned already, he wrote a

23 letter and feels responsible.  He wanted to address Your Honor

24 this morning and beg that he get Mr. Truong's sentence.  I

25 explained to him, of course, the procedures.  And after we

1  spoke, he's very comfortable not addressing the Court and

2  letting Your Honor rely upon his letter, which I think was

3  very well written and explained everything to Your Honor.

4  　　　　　THE COURT:  It was.  And his mother.

5  　　　　　MS. GATES:  Yes.  But I did want to let you know and

6  because he is here, I told Mr. Truong, Mr. Sang Truong, that I

7  would let you know that he wanted to, but now he's fine with

8  not addressing the Court.

9  　　　　　THE COURT:  I understand.

10 　　　　　MS. GATES:  Your Honor, also, I know that you read

11 the letters of reference submitted on behalf of Mr. Truong.

12 And I think in a lot of ways, he's an anomaly in the sense

13 that people who saw him in the community saw a very loving,

14 respectful person who had no idea that he would ever be doing

15 this behind closed doors.

16 　　　　　And I think that in order to be such an anomaly,

17 there must be some good in Mr. Truong, and I know that down

18 deeply, he knows that, and those around him know who know him

19 best, know there's good in him.  At his core, he must be a

20 good person and must be capable of good things if he can

21 impress for so many years on so many people what a good and

22 kind man he is.

23 　　　　　He has done many acts of selflessness and caring for

24 those around him, and he has done a number of amazing things

25 for other people.  Unfortunately, he was so needy and insecure

1 and so injured that he fell prey so easily.  And it's a truly

2 unfortunate thing when the abused becomes the abuser, and

3 that's what we have in this situation.  And again, we entered

4 into this plea agreement fully knowing he was going to do a

5 significant amount of time for what he did, and he accepts

6 that.

7          I want -- my client also wanted me to let Your Honor

8 know --

9          THE COURT:  He knows he deserves it, I assume?

10         MS. GATES:  Yes, he does, absolutely.  In fact, Your

11 Honor, it took some considerable counseling from both myself

12 and his counselor to get him from a position of knowing not

13 only that he deserved it, but having the strength to fight

14 through that guilt and actually know that he didn't have to

15 completely give up on life.

16         He had, as I indicated, some suicidal tendencies.

17 He does not have those anymore.  He was so despondent and so

18 guilt ridden and so remorseful, that we had to actually work

19 with him just to convince him to stay alive.

20         He is in a position now where, as he's told you, he

21 is strong and he wants to stay alive.  He has no more suicidal

22 ideation.  He knows that there is something else for his life,

23 and he wants to move forward for his family and son and for

24 everyone.  That's what he was trying to explain to Your Honor

25 when he said he wants to be strong and wants to stay alive to

1   show other victims and everyone that there is something on the

2   other side of this, and to make a better person for himself.

3            THE COURT:  Well, I commend you, Counsel, for

4   sticking with it in a way that has basically brought him to a

5   better place therapeutically, working with his doctors on

6   that.

7            MS. GATES:  I appreciate that, Your Honor.  It took

8   some effort.

9            I wanted to make comment to the restitution and

10  fine?

11           THE COURT:  Yes.

12           MS. GATES:  I do understand there's a statutory

13  guideline.  I would request, Your Honor, that it's my

14  understanding that Boy 1 is no longer in counseling.  He's

15  being cared for by family.  He is still in communication with

16  his grandparents on my client's side.  And he wants for

17  nothing.

18           I don't believe that there will be a need for

19  restitution; however, my client obviously would do that.  And

20  as for the fine, I'm requesting the minimum if -- the most

21  minimum because ultimately he has nothing.  The only money and

22  assets he has is his parents, and again, we would --

23           THE COURT:  Were the parents financing the travel

24  and his life in the United States?

25           MS. GATES:  No, no, Your Honor.

42

1          THE COURT:  Who financed that?  I was wondering how

2    all the trips could be made to hither and yon.

3          MS. GATES:  There's a number of factors there.  His

4    parents –– I should back up.  His parents have provided

5    financial support for him throughout his life.  That is

6    correct.  His parents gave some money to Mr. Truong and

7    Mr. Newton to have –– to get their home in Australia, and they

8    did send money to him when he was traveling at times.  That's

9    correct.

10          He was working, and Mr. Newton were working, so

11    Mr. Truong also got money from the Australian government

12    because he was technically a single parent raising a child.

13    So they had money, and some of those trips were financed by ––

14    one of the individuals that Mr. Truong has cooperated with

15    provided finances for some of those trips.

16          So there was money there at that time.  At this

17    point in time, he has nothing.  The only access that he will

18    have to money in the future will be from his parents.  So

19    Mr. Truong and I are requesting that his fine be as minimal as

20    possible so that any money that is available go to Boy 1.  We

21    would like his parents, Mr. Truong's parents, and Boy 1's

22    grandparents to have maximum ability to help Boy 1 as opposed

23    to pay fines.

24          THE COURT:  Were you retained by the family?

25          MS. GATES:  I was retained by the family, by

1  Mr. Truong's parents.

2          And with regards to his registration and release,

3  I'm not quite sure how that would work if he remains in this

4  country because he's not a citizen.  I think he will be

5  deported anyway, but he is aware of the fact that he must, if

6  he's still here, I'm hoping he's not, but if he is still here,

7  he will have to deal with that somehow, but it's my

8  expectation that he will be deported.

9          In closing, Your Honor, I would just ask you to

10 please give Mr. Truong whatever consideration and opportunity

11 and chance that you could give him in hopes that you consider

12 giving him a sentence in the lower range so that the things

13 that I've indicated with regards to the possibility of someday

14 getting to Australia are a possibility as opposed to an

15 exclusion, and we thank you very much.

16         THE COURT:  Thank you very much.

17         I want to address the deportation issue, Mr. Truong.

18 That is not a punishment or a consequence that this Court

19 orders, but is likely to happen by virtue of law, that since

20 you're in the United States illegally, that at the point where

21 immigration has jurisdiction over you, you will be deported.

22 Do you know that?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  All right.

25         Mr. DeBrota, sir, I'll hear from you.  Would you

1  like to use the podium?

2          MR. DEBROTA:  Yes.

3          MS. GATES:  Your Honor, is it all right if we sit?

4          THE COURT:  Yes.

5          MR. DeBROTA:  May it please the Court.  The

6  Government's position is that we would ask you to accept the C

7  agreement range of 324 to 405.  As we indicated in our

8  submission, we're requesting the high end of that range.

9          As I see it, there's sort of two questions that the

10 Court might address.  One of them is should the Court accept

11 the C agreement, and the second, how that scales with the

12 other sentence the Court has already given for some of the

13 same conduct.  So I want to address those sort of --

14         THE COURT:  With Mr. Newton?

15         MR. DeBROTA:  That's right.

16         So starting down the 3553(a) analysis, Your Honor,

17 we think the sentencing guidelines consider a lot of the

18 appropriate factors that the Court would have considered

19 absent guidelines; for example, the age of Boy 1 and Boy 2 at

20 the time of the offense, the relationship between Mr. Newton

21 and Truong with Boy 1; also, what happens to Boy 2 happens

22 while he's on a playdate and so forth at their residence.  So

23 he's been also sort of liable as the caregiver aspect of that.

24         There was serious sexual abuse here, and the crimes

25 could not be more serious.  And the guidelines treat them that

1  way resulting in an advisory range with the 5K.1 departure of

2  324 to 405.

3         We accept that that is an appropriate range because

4  of the 5K1 departures, which were driven by what is a lot of

5  cooperation which I'll talk about in a minute.  When we get to

6  the 3553 factors, looking at the nature and circumstances of

7  the offense, and this echos some things Your Honor has

8  observed previously.  It is the Government's view that this

9  crime, this conspiracy, comes as a result of a long-standing

10  and persistent pattern of abuse of multiple boys leading to

11  the conspiracy involving Boy 1.

12         Boy 1 was abused in the videos that the Government

13  has reviewed from around the age of 18 months until this

14  conspiracy was broken up through really phenomenal

15  investigative work by the U.S. Postal Inspection Service, and

16  other law enforcement partners.

17         The international scope of this is measured by the

18  fact that this investigation had substantial assistance from

19  Australia, New Zealand, French and German law enforcement

20  partners, as well as other countries, together with other

21  federal, state and local agencies.

22         The amount and duration of these activities is

23  unique from what we've experienced.  We have not had an

24  exploitation case like this where we have moved over this many

25  countries and involved this much planned, extensive

1  activities.  What was done here was not the result of what

2  could ever be described as an accident or an addiction or

3  slipping into behavior.

4         Mr. Newton and Truong were heavily involved in child

5  pornography activities and abuse before Boy 1 is even born.

6  So what we have by the time they acquire Boy 1 is we have them

7  in a position where when he gets old enough to be potentially

8  subject to abuse, they start doing that.

9         The result was carefully documented by date and

10 location and folders in the collection of child pornography.

11 Some of that material went to other co-defendants, other

12 people involved in the conspiracy, and fortunately was

13 discovered by law enforcement through that mechanism.

14 Otherwise, there wouldn't have been anything to stop this.  So

15 this was a result of that information getting out and then

16 very painstakingly being investigated, and the persons

17 involved in that being held responsible.

18        The child pornography from this investigation was

19 filmed in large measure with hi-definition cameras.  And in

20 order to analyze that and to hold the people who are involved

21 in making it responsible, the Government investigators, people

22 in my office, myself, had to not just watch the child

23 pornography, but watch it with the sound on to listen to see

24 if we could hear voices in the background, identify those, and

25 so forth.

1        The reason why, in our sentencing memo, we described

2 this as an extreme set of circumstances comes after having

3 listened to probably 80 videos, some of great length, and

4 having to do that over the period of several days.  That was

5 very difficult to do.

6        Now, one of the reasons why the Government puts this

7 plea agreement before you is the vision of what a jury would

8 have to deal with, what court staff would have to deal with,

9 if we did that in court.  And what Boy 1 might be exposed to,

10 Boy 2 and others if that occurred as well.

11        So having fully understood the horrific nature as

12 you've described it, the nature and circumstances of the

13 offense, we have the plea agreement which we think is a fair

14 accommodation of the sentencing consideration, and a wide

15 range of other considerations.  In terms of looking at the

16 severity of this within that range of the plea agreement, we

17 do think that the psychological harm and trauma Boy 1 and

18 others will experience can't be isolated to any one prediction

19 of how well anyone's doing.

20        We know that the long-term effects of this kind of

21 abuse manifest itself in effects on relationships over the

22 course of a lifetime.  I'll note Mr. Truong states as much.

23 He's right on that.  There is a long road Boy 1 will have to

24 walk and the others will have to walk.  Part of this was

25 psychological manipulation of that boy.  He never understood

1  what he was doing was horrific and wrong.  His childhood was

2  interfered with in the production of this material, but has a

3  long term and sustained effort to convince him not to tell

4  anyone else who was going on.  There was very heavy use of

5  social networking by Newton and Truong, the use of data

6  encryption, sophisticated techniques, to protect this material

7  and to share it with other people in a tight-knit conspiracy.

8          Conspiracies like this have a special power to

9  motivate the behavior of the person involved.  That's why the

10 law has special consequences for conspiracies, when it insists

11 people like in these circumstances do this, to engage in

12 disordered thinking that what they are doing okay, that it's

13 not causing harm, but that it's good.  He identified himself

14 as a boy lover and referred to people as boy lovers.

15         If you get a group of people together engaging in

16 that kind of thinking for a long enough period of time, they

17 may come away with it with a sense of entitlement or

18 empowerment.  In any event, with less impulse control, all of

19 that had a terrible power in this case.

20         Now, what's depicted in those high-definition videos

21 includes flat-out sexual abuse.  It is not violent in the

22 sense that it could have been violent, but it is a crime of

23 violence in every sense, and it's a profound betrayal of

24 what's going on with that child.

25         I suppose it's possible we could have something

1   worse on video, but I hope we don't see it, and anyway, I

2   haven't seen it in this volume or in high definition before.

3   So we stand by our description of that content.

4          Now, to get access to Boy 1 and to get custody

5   temporarily of others, this defendant had to engage in a

6   manipulation of the authorities that would have jurisdiction

7   over Boy 1, other persons and parents and so forth and

8   caregivers.  That manipulation took planning and it was done

9   successfully.

10         Some of the stuff that's filmed is filmed in their

11  house in Australia using cameras placed in locations

12  anticipating that things would happen.  This was done

13  carefully and documented carefully, was edited and placed in

14  the collection, and sorted by place and date.  This went on

15  for a very long period of time.

16         Turning to the defendant's history and character, we

17  agree that prior abuse does not cause future conduct or future

18  abuse.  It may be a risk factor of this defendant, but these

19  events occur when he is well into adulthood before he is

20  caught.

21         He has a long-standing and persistent pattern of

22  sexual attraction to minors.  Whether he shares that with

23  Mr. Newton and others that he's discussed doesn't change the

24  point that he's an active participant in that activity.

25         He collected child pornography, carefully preserved

1   it and sorted it.  He socialized with other boy lovers on a

2   large number of occasions.  He fueled his sexual fantasies.

3   He trafficked in that material.  He rationalizes his behavior

4   was harmless.  He aided in this sort of thing for himself --

5               COURT REPORTER:  Could you slow down.

6               MR. DEBROTA:  -- but certainly others as well.

7               And he did cooperate, but not at first.  The first

8   cooperators in this case were not Newton.  Newton never

9   cooperated, not this defendant or Mr. Bettuo, who the Court's

10  already sentenced.  There were others who came forward much

11  earlier.

12              The sentence the Court has to pick has to promote

13  respect for the law and ensure just punishment.  We think that

14  a sentence of 405 months is appropriate for what are among the

15  most serious crimes in the U.S. code in their ability to rob

16  children of their childhood.  In some child pornography, we

17  talk about that more in the abstract.  Here we have the brutal

18  reality of exactly what we're talking about here.

19              When Boy 1 was first interviewed, an FBI forensic

20  examiner described his level of trauma as ten of ten.  He may

21  be doing better now, and we certainly hope so, but we don't

22  have an example of someone who was subjected to this

23  systematic a conspiracy involving this many people.  This

24  court has never sentenced someone in a case of that level of

25  trauma.  I'm confident that that's true.  So we do think that

1  in understanding just punishment and promoting respect for the

2  law, this is an extremely egregious case.

3         Now, turning to the question of why should this

4  defendant receive a lower sentence of 405 months instead of

5  480 you gave Mr. Newton.  I think there are three reasons for

6  that.

7         The first and most important is that the

8  investigators, the Government, the governments that were

9  involved here, recognized that there was a paramount interest

10 to protect children that's always involved in Crimes Against

11 Children's cases.  The fact of the matter is, this defendant

12 did cooperate, he did decrypt his computer, and he did provide

13 information in several proffers that was invaluable to help

14 identify and hold responsible other defendants who engaged in

15 this conduct whose activities he knew about directly.

16        That's an ongoing process, but it did work.

17 Mr. Newton had all of those same opportunities, all of that

18 same information, and did nothing whatsoever.  In fact, we now

19 know he clearly hid his activities to the end.  So viewed as a

20 matter of the value of the cooperation, there was value here.

21        When we train new prosecutors in these cases, we

22 tell them that if the day comes when you can't get cooperation

23 to save a child, you can't prosecute a Crimes Against Children

24 case, it's too important to do that, even at the risk of a

25 lower sentence, a slight lower one.  So the 75-month discount

1   here is a price we would pay every day of the week if we could

2   rescue as many kids as we could here with that cooperation.

3        Second, Mr. Newton had no back story as this one

4   does, this defendant does.  And you've heard the back story

5   and you've read it.

6        And finally, Mr. Newton's allocution, I would

7   suggest, was the equivalent of "I'm sorry I got caught."  We

8   heard something else here.

9        So for all those reasons, Your Honor, we would ask

10  you to accept the plea agreement and impose the sentence as

11  we've described in the plea agreement.  Thank you.

12       THE COURT:  Thank you, Mr. DeBrota.

13       I was impressed by the extraordinary and

14  extraordinarily successful investigation as well.  These

15  investigations don't just happen by showing up to your

16  government job working nine to five.

17       These are very difficult cases, and they take a huge

18  amount of resources.  This one took all kinds of international

19  involvements and investments, and they take a personal toll as

20  Mr. DeBrota said, because it pulls you into investigative

21  material that most people of ordinary sensibilities would like

22  to spend their lives having not to access.

23       So when you do it for a good purpose, to basically

24  shut down the kind of harm that is caused, the fact of the

25  investigation itself and the good purpose don't completely

1  eliminate the personal toll that's taken on all the people who

2  are involved, lawyers among them.  So I just want to state

3  that that's not been lost on this judge.

4          Ms. Gates, would you bring Mr. Truong back with you,

5  please, to the podium?

6          Mr. Truong, the task that the Court faces in making

7  this decision with respect to what is a reasonable sentence,

8  neither too lenient nor too harsh to accomplish the goals of

9  sentencing is, as I alluded to earlier, a highly nuanced

10 process; that as much as I'd like to be able to just sort of

11 lower the boom, it doesn't seem to be called for on either

12 side.  It takes a more thoughtful consideration of these

13 factors.

14         Of the 3553(a) factors, they all have relevance, of

15 course.  They all have their persuasive pull.  But one of them

16 certainly has to be deterrence, and not just you.  I'm

17 confident that all of this has at least brought us to a point

18 where we don't have to worry anymore about your involvement in

19 this kind of activity.

20         But the extent to which it goes on in the world is

21 not something we can ignore.  And in fact, it's one of the

22 justifications for the prosecution itself is to make it clear

23 to all that there are serious consequences that flow in a

24 penalogical sense.  You've told us about a lot of the

25 psychological consequences, the sociological, the family and

1  so forth.

2       Those are relevant important factors, too, but one

3  of the big factors is that somehow the word has to get out

4  that this behavior has to stop because it doesn't happen ever

5  without there being a victim.  And the victims are always

6  vulnerable victims.

7       They may not be as well known to the participants in

8  the case as Boy 1 was to you, your very son.  They may not be

9  people we can even name, that they have never been identified,

10  but the tragic fact is that with every episode, not just every

11  prosecution, but every episode of child pornography, at least

12  one child is victimized.  And these are the vulnerable

13  victims.  These are the people who can't defend themselves and

14  they are used for just breathtakingly sordid purposes.

15       Now, I can't say that without acknowledging that

16  there really was, I know, between you and Boy 1, a huge amount

17  of father/son affection and interest and involvement and so

18  forth.  But there was something about it that made it very

19  wrong.  It went bad.  It wasn't just being a good father.  It

20  was using this child for improper, indeed very bad purposes.

21       The thing that makes them bad is that he'll live

22  with them all the rest of his life.  And even though we're all

23  sort of breathing a sigh of relief that right now he seems to

24  be adjusting, and he seems to be adapting to his new life,

25  there will come a point when he has to confront the hard facts

1   of his whole life, this whole situation.

2          There won't be any mystery because all of these

3   facts now have been told.  So he not only has to learn in the

4   course of it that his birth mother didn't want him, gave him

5   up, but sold him to a willing buyer who had to lie and mislead

6   and deceive and pretend in order to get him, and then to live

7   a lie.

8          It is true that some flowers bloomed, but man, they

9   had to come up through the cracks of the cement in this case.

10  It was not a garden.  And somehow, some flowers bloomed.  I

11  guess we can't explain it.  We just have to be grateful for

12  the fact that there were some.

13         So, we have to deter you.  We have to keep this from

14  happening again.  I don't have too many doubts about that.  I

15  take what you say as having been sincerely stated, that you

16  have, with the help of therapy and the right medications, come

17  to a clear understanding of how all this happened, and that

18  you still have value and worth as a human being.

19         When we punish people for their crimes, we take

20  their freedom from them.  We don't take their dignity.  We

21  don't take their opportunity to grow in other ways and to

22  develop whatever is in you that's good that can be developed.

23  It's harder clearly in prison to do it than it would be

24  otherwise, but you still have the opportunities to do some of

25  the things you say you want to focus on and do.

1          That's good.  It's very heartening to know that

2     you've moved to a point where suicide is not viewed by you as

3     an option.  That would be tragedy on tragedy here.  So I hope

4     you can continue to get the help you've gotten so far so you

5     can purge all that additional level of tragedy.

6          Everybody acknowledges that you did everything you

7     apparently could to right the wrongs.  The problem is the

8     wrongs were so horrific that they couldn't be wiped away.

9     They could only be alleviated by your assistance, but yours is

10    acknowledged.

11         What to make of the international aspects of this

12    and the treaty and so forth, that's almost more than I can

13    fold into a sentencing decision today.  I'll just have to

14    sentence this offense as best I can under the relevant factors

15    that are laid out in the code under 3553(a).  But I hear that

16    it may take a different turn later on because of your status

17    as an Australian citizen.

18         The other thing I wanted to mention is that I do see

19    clearly the differences between your reactions to all of this

20    prosecution and so forth as compared to Mr. Newton's.  So I

21    accept the party's 11(c)(1)(c) agreement as reasonable and

22    appropriate.  It reflects your substantial assistance, so I'll

23    grant that motion.

24         In trying to balance all of the factors that have

25    been laid out, the sentence that I'm going to impose is 360

1  months.  It's in the middle of the guidelines.  It perhaps

2  reveals the tug of both arguments to go one way or the other.

3  It is obviously an effort to balance all of these

4  considerations.

5          I think that that's reasonable in the sense that

6  it's sufficient punishment, but it's not debilitating.  It

7  doesn't rob you of any hope that you'll some day be able to

8  move past all of this in a healthy way and a law-abiding way.

9  If we can accomplish both of those goals, that will be quite a

10 lot for this particular prosecution.

11         So the period of incarceration that I'm going to

12 impose is 360 months.  I think we have to do this in a

13 bifurcated way because there are two prosecutions.  So it's

14 ten years, which is 120 months, on the Cause No. 1:12-31, and

15 so the 20 years will be on Cause No. 1:12-23.  And I think I

16 have it figured out right in terms of the particular cause

17 number.  Do I?

18         MR. DeBROTA:  The cause number on the first one is

19 1:13-cr-31, 13-30 case, a 2013 case.

20         THE COURT:  Oh, that is true.

21         MR. DeBROTA:  It's the second one.  The first one

22 would be the one with the longer sentencing exposure.

23         THE COURT:  Right.  So that's why the 20 years on

24 the first count, which is 1:12-23; is that right?

25         MR. DeBROTA:  You have the option -- to achieve a

1  total sentence of 30 years of statutory exposure on the

2  conspiracy charge, he has 15 to 30.  So you could do 30 on

3  that and a concurrent ten on the other and get to the same

4  point.

5         THE COURT:  That's what I want to do.  Twenty

6  years --

7         MR. DeBROTA:  You could do 30 and concurrent ten as

8  opposed to 20.

9         THE COURT:  Okay, that's fine.  Thirty with

10 concurrent ten.  Got that, Ms. Fitzgerald?

11        PROBATION OFFICER:  I do, Your Honor.

12        THE COURT:  The period of supervised release is a

13 life term of supervised release.  Ten years -- it's a life

14 term under the guidelines, but I'm going to impose a ten-year

15 limit.  That does take into account the fact that you'll

16 probably be in Australia, and so ten years supervised release

17 on each count to run concurrently.

18        The fine amount will be $2,500.  It's well below the

19 guidelines.  It's intended to be enough punishment to serve as

20 a further reminder of the offense that has occurred.

21        The special assessment of $200 has to be paid

22 because it's nonwaivable, so I impose that as well.  In terms

23 of the conditions of supervised release during that ten-year

24 period, I'll state what they are so the record reflects them.

25        You must not commit any other federal, state or

1 local offense while you're on supervised release.  You must

2 not possess a firearm, ammunition, destructive device or other

3 dangerous weapon.  You must cooperate with the collection of a

4 DNA sample.  You must refrain from all unlawful uses of

5 controlled substance.  I'll require you to submit to one drug

6 test within 15 days of placement on supervised release, and

7 two periodic tests thereafter.

8           The fine of $2,500 that I've imposed, and any amount

9 that remains unpaid at the commencement of supervised release

10 has to be paid as a condition of supervised release.

11           You must give the probation officer access to any

12 requested financial information, refrain from opening any new

13 lines of credit or new credit charges without the prior

14 approval of the probation officer.

15           I'll require you to participate in a program of

16 mental health treatment as directed by the probation officer.

17 I'm going to recommend to the Bureau of Prisons that during

18 your period of incarceration, that you have mental health

19 treatment ongoing throughout this process.

20           THE DEFENDANT:  Thank you.

21           THE COURT:  So, Ms. Fitzgerald, would you make sure

22 that shows up as well?

23           PROBATION OFFICER:  Yes, Your Honor.

24           THE COURT:  You'll be required, as a condition of

25 supervised release, to submit to being searched, and the

1 probation officer has permission to search virtually

2 everywhere that you are and you go.  So it means your person,

3 vehicle, office, business, residence and property, including

4 computer systems and peripheral devices.

5           You must submit to the seizure of any contraband

6 that's found, and therefore you should forewarn any occupants

7 of the places where you are, and that you go, that you're

8 subject to being searched because it can implicate their

9 rights as well.

10          I will prohibit you from possessing or using a

11 computer unless you agree to comply with the computer

12 restriction and monitoring program at the direction of the

13 probation officer.

14          Monitoring will occur on a random or regular basis.

15 The defendant, that's you, must advise probation officer of

16 all computers that are available to you for use.  Any computer

17 or Internet-enabled device that you're found to have used or

18 not disclosed shall be considered contraband and may be

19 confiscated by the probation officer.

20          So you should forewarn the other occupants of the

21 monitoring software placed on your computer.  As I impose this

22 condition, my mind sort of reels to think what the

23 technological situation will be in 30 years.  I expect this

24 condition might be read as quaint 30 years out, but I'll

25 impose it nonetheless.

1        You must not possess any pornography, erotica or

2   nude images, and any such material found in your possession

3   will be considered contraband and confiscated by the probation

4   officer.  You must participate in a program of treatment for

5   sexual disorders, including periodic polygraph examinations as

6   directed by the probation officer.  I'll authorize the release

7   of this presentence report and any available psychological

8   evaluations to the mental health provider as approved by the

9   probation officer.

10        You must not have any unsupervised contact with any

11  minor child unless that contact has been disclosed to and

12  approved by the probation officer.  In determining whether to

13  approve such contacts involving members of your family, the

14  probation officer will determine if you have notified the

15  persons having custody of such minors about your conviction in

16  this case, and the fact that you're under supervision.  If

17  this notification has been made, and if the person having

18  custody consents to contact, then this condition is not

19  intended to prevent you from having such contact.

20        Lastly, you must register as a sex offender with the

21  appropriate authorities in any state in which you reside, are

22  employed or attend school.

23        The sentence will also incorporate the penalties

24  that you acceded to with the forfeiture, so the matters that

25  are listed in the presentence report, which I'll delineate

1  here quickly, must be forfeited by you to the Government.  So

2  the Panasonic ST800 video camera, the Canon camera, involving

3  the lens and bag, and any computer or other device capable of

4  storage of digital files that was in whole or in part

5  encrypted, and contains indicia of encryption passwords,

6  including without limitation the five specified items therein.

7         I am prepared to make a recommendation as to the

8  place of incarceration if you wish to have me do that as well

9  as recommending to the Bureau of Prisons that Mr. Truong

10  receive the appropriate mental healthcare, including medical

11  care that he needs.  Do you have a request?

12         MS. GATES:  Your Honor, there are two facilities

13  that we would request, either Rochester FMC or FCI Butner,

14  B-U-T-N-E-R.  Both of those, from what I've been able to

15  determine, have a psychological component, and I believe they

16  are facilities with the security level where he would be.

17         THE COURT:  I'm quite familiar with Butner, less

18  familiar with Rochester, but I'll make both of those

19  recommendations to the Bureau of Prisons.

20         Mr. Truong, you need to know that I can only make

21  recommendations to the Bureau of Prisons.  I can't order them

22  to put you someplace in particular, but usually they pay some

23  attention.  I never know quite how much, but some, to what we

24  say.

25         The important thing is that you receive the mental

1 health counseling and sexual offender treatment that is

2 warranted here, so we'll underscore that with the Bureau of

3 Prisons.

4           That's the sentence that I intend to impose.  Do you

5 have any legal objection to it, Ms. Gates, or do request any

6 further elaboration of my reasons?

7           MS. GATES:  No, Your Honor.

8           THE COURT:  How about you, Mr. DeBrota?

9           MR. DeBROTA:  One matter, Your Honor.  We would ask

10 you to include within the forfeiture as contemplated on page

11 nine of the plea agreement, that it would include all child

12 pornography or child erotica together with any storage media

13 or medium containing such material.  There's some more stuff

14 beyond what we have here.

15           Also have it be clear that this applies to any media

16 in the United States or in the hands of Australia law

17 enforcement.  For example, some of the original devices are

18 over there and they would be disposed of.

19           THE COURT:  I accept that addendum to the forfeiture

20 order just as you've stated it.

21           MR. DeBROTA:  We also do, pursuant to the plea

22 agreement, need to move to dismiss Counts 2 through 4 in the

23 lower Cause No. 1:12-CR-23, and we would follow that up with a

24 written pleading.

25           THE COURT:  I'll orally grant your motion for the

64

1    dismissal of those counts as well.

2            So the sentence that I've outlined as my sentence,

3    Mr. Truong, is now imposed and is the judgment of the Court.

4    And you will be bound by these limitations and restrictions

5    for the periods of time and in the ways that have been

6    specified until the judgment's fully satisfied.

7            THE DEFENDANT:  Your Honor --

8            THE COURT:  My understanding of the plea agreement

9    is that you've waived your right to appeal this sentence

10   because it is a sentence that comes within your 11(c)(1)(c)

11   agreement.  That's not my decision to make, though, so you

12   need to make sure you talk to Ms. Gates about that so you have

13   a clear understanding of where each of you is on that

14   question.

15           If you believe you've retained a right to appeal the

16   sentence, you need to do that within two weeks of the entry of

17   the judgment on the court's docket.  Let's see, this is

18   Monday, that will occur this week, so you can count out the

19   two weeks and you'll know that's when the time runs for you to

20   make that decision.  So it's important you have that

21   discussion right away so you both know what the other one is

22   thinking and can benefit from that.

23           Now, what did you want to say?

24           THE DEFENDANT:  Your Honor, I don't recall you

25   saying anything about restitution.

65

1          THE COURT:  Restitution?  I'm not going to impose

2    restitution.

3          THE DEFENDANT:  Okay, thank you.

4          THE COURT:  I'm yielding to the statement of counsel

5    that Boy 1 would be the subject of the restitution.  I didn't

6    hear any other recommendation for a specific amount.

7          Mr. DeBrota?

8          MR. DeBROTA:  Let me further elaborate on that.

9    This defendant is essentially indigent, Your Honor.  Boy 1

10   does have counsel in California.  They are pursuing a very

11   substantial amount of restitution against one of the other men

12   who presently has a pending case in New Jersey.

13          I don't want the Court to have the wrong impression.

14   Certainly Boy 1's civil lawyers are certainly seeking

15   restitution, but I don't think they saw much point in seeking

16   it here.  I have no problem if they want to agree to this, to

17   have the fine of 2,500 changed into restitution in equal

18   amounts to Boy 1 and Boy 2 if they are willing to agree to

19   that.  I'm not sure it's ever going to get collected.

20          THE COURT:  Are you willing to make that refinement

21   in the judgment?

22          MS. GATES:  Yes, Your Honor.

23          THE COURT:  All right.

24          We'll do it that way, Ms. Fitzgerald.  It will be a

25   restitution order rather than a fine.

1          MR. DeBROTA:  In equal amounts to Boy 1 and Boy 2,

2    and we'll supply the information to probation as to the

3    address.

4          THE COURT:  I'll do it just that way.  The judgment

5    then, as I've said, is going to be drawn up in a Judgment and

6    Commitment Order, and it will bind now you in these ways until

7    it's fully satisfied.

8          Is there something further that you wanted to say

9    beyond the restitution?

10         THE DEFENDANT:  No, I just wanted to thank you, Your

11   Honor.

12         THE COURT:  You should thank counsel here.  Both

13   counsel did a wonderful job in getting this case positioned so

14   that the Court could make what I hope is a reasonable

15   determination.

16         Good luck to you.

17         THE DEFENDANT:  Thank you.

18         THE COURT:  Good luck to your parents as well.

19         THE DEFENDANT:  Thank you, Your Honor.

20         MS. GATES:  Thank you.

21              (Court adjourned at 11:52 a.m.)

22

23

24

25

CERTIFICATE OF COURT REPORTER


        I, Laura Howie-Walters, hereby certify that the
foregoing is a true and correct transcript from reported
proceedings in the above-entitled matter.



/S/LAURA HOWIE-WALTERS   February 7th, 2014

LAURA HOWIE-WALTERS, FCRR/RPR/CSR
Official Court Reporter
Southern District of Indiana
Indianapolis Division